Below is a Memorandum Decision of the Court.



**Marc Barreca**
**U.S. Bankruptcy Court Judge**
**(Dated as of Entered on Docket date above)**

1

2

3

4

5

6  _____

7  —

8

9

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

10

11  In re:

12  BREAST CANCER PREVENTION FUND,

13  Debtor.

Case No. 13-16150-MLB

**MEMORANDUM OPINION PARTIALLY
GRANTING MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**

14

15    These matters came before me for hearing on April 20, 2017 on the Motion to Allow Claim In

16  Part / For Partial Summary Judgment Regarding Breach of Fiduciary Duties (the "**Motion Regarding**

17  **Breach of Fiduciary Duties**," Dkt. No. 196) by Nancy L. James, Chapter 7 Trustee (the "**Trustee**") for

18  the bankruptcy estate of the Breast Cancer Prevention Fund ("**BCPF**"); and on June 8, 2017 on the

19  Motion for Partial Summary Judgment Regarding Pledge Cards, Joint Cost Accounting, and Scripts (the

20  "**Motion Regarding Violation of the CSA and CPA**," Dkt. No. 227) by the State of Washington (the

21

22  "**State**").[1]

23  _____

24  [1] The AG filed a proof of claim in BCPF's bankruptcy in the amount of $20,280,512. (Claim Nos. 5-1 and 5-2). The Trustee brought a motion to allow the AG's claim, which was opposed by Paton, Legacy, and Clark Nuber. These summary judgment motions are brought in advance of the evidentiary hearing on the claim objection, currently set for November and December 2017.

25

MEMORANDUM OPINION - 1

The Trustee was represented by Scott Henrie and Manish Borde and Williams, Kastner & Gibbs, PLLC. The State was represented by the Office of the Attorney General (the "**AG**") and Tad Guy Robinson O'Neill. Legacy Telemarketing Corporation ("**Legacy**") and James C. Paton ("**Paton**") were represented by Aric Bomsztyk and Barokas Martin &Tomlinson. Clark Nuber, P.S. ("**Clark Nuber**") was represented by Justin Bolser and Lori O'Tool and Preg O'Donnell & Gillett PLLC.

Following oral arguments, I took the matters under advisement. On July 26, 2017, I granted the parties limited permission to supplement the summary judgment record. (*See* Dkt. No. 282.) Given the significant overlap of parties, claims, defenses, and underlying facts, I considered the matters together.

Now, having fully considered the matters and being fully advised, I partially grant the Trustee's Motion Regarding Breach of Fiduciary Duties and partially grant the AG's Motion Regarding Violation of the CSA and CPA.

## I.    JURISDICTION

I have subject matter jurisdiction over the AG's claim pursuant to 28 U.S.C. §§ 157(b)(2)(B) and 1334.[2]

---

It is notable that the Trustee filed a lawsuit against, *inter alia,* Paton, Legacy, and Clark Nuber, asserting various claims related to the downfall of BCPF. *See James v. Paton,* et al., 15-01164-MLB (Bankr. W. D. Wash. filed June 30, 2015). Subsequently, the reference was withdrawn, and the case is now pending before Judge Robert S. Lasnik ("**Judge Lasnik**") in the District Court of the Western District of Washington, Civil Case No. C15-1914RSL.

[2] Unless otherwise noted, all docket references herein are to *Breast Cancer Prevention Fund*, 13-16150-MLB (Bankr. W.D. Wash. filed July 2, 2013).

MEMORANDUM OPINION - 2

**Below is a Memorandum Decision of the Court.**

## II. RELEVANT FACTS

### A. Legacy Telemarketing Corporation

Paton founded Legacy in 1992 as a telemarketing company serving both for profit companies and nonprofit charities. (Dkt. No. 198-1 at 46; Dkt No. 204 at 6).[3] In 2005 Paton retired from the day-to-day management of Legacy. (Dkt. No. 204 at 6 n.4). Around 2006, Jeff Cunningham ("**Cunningham**") became Legacy's President. (Dkt. No. 236-1 at 5). However, from 2005-2012 Cunningham consistently reported to Paton such that Paton effectively continued to control Legacy. (Dkt. No. 228 at 38-39). Paton reviewed Legacy's requests for proposals and assisted in drafting the scripts Legacy telemarketers used in providing telemarketing services. (Dkt. No. 228 at 40-41). Paton also reviewed and gave input on Legacy's contracts. (Dkt. No. 228 at 42). Paton also at least occasionally reviewed Legacy employee evaluations. (Dkt. No. 228 at 44).

### B. Breast Cancer Prevention Fund

Paton formed BCPF in 2004. (*See* Dkt. No. 152 at 1; Dkt No. 202 at 22). He asserts he was inspired to start BCPF after several experiences in which breast cancer indirectly touched his life. (*See* Dkt. No. 204 at 7-9). He also asserts he had become frustrated with the inefficacy of another breast cancer charity with which Legacy had worked. (*See Id.*).

Paton asserts he founded BCPF with a tax exempt purpose to (1) remind women to regularly perform self-check exams and provide educational materials; (2) inform uninsured women that they could get a mammogram for free or little cost; (3) refer uninsured women to clinics that provide free or low cost mammograms, (4) offer and mail breast exam self-check shower cards at no charge; and (5) fundraise. (Dkt. No. 152 at 1). The AG asserts that Paton formed BCPF to create a client for Legacy,

---

[3] Citations refer to the document and exhibit numbers in ECF, and pagination refers to the page numbers of the relevant PDF documents.

MEMORANDUM OPINION - 3

1  and that Paton intended for a significant portion of donations raised on behalf of BCPF to flow back to

2  himself, through Legacy.  Paton denies this allegation.  (Dkt. No. 204 at 7, 10).

3      BCPF's articles of incorporation provided in relevant part:

> The purpose for which the corporation is formed is: promoting prevention
> and early detection of breast cancer, encouraging breast-self exams,
> providing funds to pay for mammograms for uninsured women, raise
> awareness and educate the general public about breast cancer, and
> providing funding for breast cancer research.

7  (Dkt. No. 198-1 at 87).  BCPF's bylaws provided in relevant part: "[t]he specific objectives and

8  purposes of this corporation shall be: Public Benefit Corporation – (charitable purpose)."  (Dkt. No. 198-

9  1 at 15).

10      BCPF's board of directors (the **"Board"**) was comprised of Paton and other individuals,

11  including, but not limited to, Joyce Bottenberg ("**Bottenberg**"), Greg Sheffield ("**Sheffield**"), and James

12  Sheehan ("**Sheehan**").  (*See e.g.*, Dkt. Nos. 202 at 6-7, 14, 17, 19, 24; Dkt No. 152 at 1-2).  BCPF's

13  stated mission in its Annual Reports for 2006-2009 was "to save women's lives by promoting

14  prevention and early detection of breast cancer through awareness and education, and providing funds to

15  pay for mammograms for uninsured women."  (*See* Dkt. Nos. 202 at 12, 15, 18, 22).

**C.  BCPF-Legacy Relationship**

17      BCPF's Board decided to use telemarketing to accomplish its stated mission.  (*See* Dkt. No. 152

18  at 4, Dkt. No. 204 at 2, 11).  BCPF sent out a request for proposal to all registered professional

19  fundraisers in Washington, including Legacy.  (Dkt. No. 152 at 4-5; 152-6 at 36).  Paton asserts that he

20  disclosed to BCPF's Board that he had an ownership interest in Legacy and then recused himself from

21  any decision to hire Legacy.  (Dkt. No. 152 at 5, Dkt. No. 204 at 2).  For example, the minutes from that

22  meeting state that:

> RESOLVED, that Legacy was the only qualified firm that responded to
> the RFP.  James C. Paton while an owner of Legacy is not directly

MEMORANDUM OPINION - 4

involved in the day to day management and has previously stepped down as corporate President, excused himself from further discussion on this matter.

(Dkt. No. 152-6 at 36).  BCPF hired Legacy in October 2005.  (Dkt. No. 152 at 5, Dkt. No. 204 at 7; Dkt. No. 239-1 at 2-6).  Paton asserts that the Board chose to hire Legacy in large part due to a "stop loss" provision so that BCPF would always be guaranteed funds for working capital.  (Dkt. No. 152 at 5).  The BCPF-Legacy contract (the "**BCPF-Legacy Contract**") was approved by the BCPF Board, and it does not appear based on the evidence submitted that the rates charged under the BCPF-Legacy Contract were outside of market norms.  (Dkt. No. 152 at 5, Dkt. No. 204 at 2).

The Trustee argues that Paton always enjoyed 100% of Legacy Telemarketing's profits and was its sole shareholder.  Paton asserts that at some point he entered into a stock option agreement with Cunningham, and believed this granted Cunningham an ownership interest in Legacy, leaving Paton with a 92% ownership interest.  (Dkt. No. 204 at 6 n.4; 15 n.7).  It does not appear from the record that Cunningham ever held any ownership interest in Legacy but, regardless, Paton owned all or substantially all of Legacy at all relevant times.  (*See* 198-1 at 46).

Between 2006 and 2011, BCPF constituted 91% (2006), 96% (2007), 97% (2008), 99% (2009), 99% (2010), and 98% (2011) of Legacy's revenues.  (Dkt. No. 198-6 at 102-103).

**D.     Legacy's Campaign on Behalf of BCPF**

**1.   Solicitation Calls**

Legacy telemarketers made solicitation calls to consumers on behalf of BCPF.    Each call lasted an average of less than a minute.  (*See* Dkt. No. 202 at 27-42).  Legacy contacted consumers in Washington, California, Texas, Florida, Georgia, and Pennsylvania.  (Dkt. No. 152 at 2).

MEMORANDUM OPINION - 5

## 2. <u>Scripts</u>

Legacy telemarketers followed telephone scripts during their calls with consumers. Multiple versions of scripts were used over the years, and numerous samples appear in the record. (*See e.g.,* Dkt. No. 228 at 7-33 (providing a demonstrative exhibit of scripts and donor cards used during BCPF's operations). Also, at times, even the "approved" scripts were modified on the floor to test consumer's responses to the script variations. (*See e.g.,* Dkt. No. 201 at 12, 31-33). Although the scripts varied over the years, the scripts consistently (1) inquired as to whether women in the household were up-to-date on mammograms, (2) inquired as to whether those women had insurance covering mammograms, (3) inquired as to whether the consumer would like to receive a shower card on conducting breast self-exams, and (4) requested a donation.

For example, a 2007 script that was identified as having been approved by Paton provided as follows:

> This is (*your first name*) with Legacy calling on behalf of the Breast Cancer Prevention Fund?
>
> Is this (*First & last name*)?
>
> The reason for my call is that Breast Cancer Experts recommend that all women over 40 years old receive annual mammograms and understand how to perform self-breast exams . . . I'm calling to ask if you have had a mammogram with the past year?
>
> **IF YES GO TO BREAST CARDS\*\***
>
> **IF NO:** Do you have insurance that covers this procedure?
>
> **IF NO: (*DO NOT ASK THESE WOMEN FOR A DONATION, SKIP PART 3*)**
>
> Mammography is the best way to detect Breast Cancer in its earliest, most treatable stage – an average of 1 to 3 years before a woman can feel the lump. We encourage every woman over 40 years old to get a mammogram once a year. Can I refer you to the Washington State Breast

MEMORANDUM OPINION - 6

and Cervical Health medical clinic in your county for a referral to a clinic so you can schedule an appointment for a mammogram?

** We also have an instruction card on Self Breast exams that I'd like to send out to you if you have any women in the household, or know of a woman that could use it. May I mail one out to you?

OK let me verify your Name and Address . . . .

I will personally rush out the Breast Self Exam instructions from our office in (*City*), so it should arrive within the next few days. This is a waterproof card and you can hang it in your shower.[4] Please use it at least monthly.

We also pay for mammograms for uninsured women.
Mammograms cost about $90.
Would you be able to help 2 women at $180?

(Dkt. No. 228 at 13-14). In another script the donation request was phrased as

*First name*, just so you know,
*Mammograms cost about $90 dollars each.
*Currently our waiting list is so long, we are asking folks if they can help 2 women at $180 dollars. Can you help 2 women?"

(Dkt. No. 229 at 21). In another script the donation request was phrased as,

*Mammograms cost about $90 dollars.
*This year the need is so great, we are asking folks if they can, to help 2 women at $180…can you help 2 women?

IF NO: Could you help 1 woman?
IF NO: Some of our supporters are sharing the cost at $45. Could you help with at least that much?

(Dkt. No. 228 at 7-8).

The telemarketer provided a "referral" for a consumer to follow-up about receiving a mammogram in only about 0.13 of one percent of the calls -- which merely consisted of providing a phone number for another group(s) that provided mammograms. (*See* Dkt. No. 202 at 27-42).

---

[4] A shower card had instructions and images to assist a woman in performing a breast self-exam. (*See e.g.*, Dkt. No. 230 at 11, 14).

MEMORANDUM OPINION - 7

The scripts consistently failed to disclose Legacy's role as a professional fundraiser or the role of Legacy employees in making the phone calls. Some scripts instructed telemarketers to say that "This is (your name) with the Breast Cancer Prevention Fund" - omitting mention of Legacy altogether. (*See e.g.,* Dkt. No. 228 at 8, 11, 25, 27). Other scripts referenced the caller being from "Legacy" but without any description of Legacy's role. In addition, the scripts consistently used the first person plurals, "we" and "our" - effectively obscuring the identity between BCPF, the charity, and Legacy, the commercial fundraiser. (*See generally*, Dkt. No. 228 at 7-33).

Paton asserts that the scripts were drafted such that BCPF's education and outreach mission took precedence, in order and emphasis, over fundraising. (Dkt. No. 237 at 2-3). However, Legacy floor manager Mary Heath acknowledged her primary responsibility was to increase profitability by increasing dollars returned per hour. (Dkt. No. 201 at 21).

Paton also provided a "rebuttal" script for Legacy's telemarketers to use in the event that a consumer had questions or raised objections. The rebuttal script provided in relevant part,

> Please study these objections and the corresponding rebuttals. It is very important that you learn and understand how to respond to each and every objection; your success depends on it. Over half of your pledges result from correctly addressing objections.

(Dkt. No. 228 at 69-73). If a consumer mentioned another charity, Legacy telemarketers were instructed to respond, "That's great…they are a wonderful organization…We save lives right now…we help pay for mammograms for women without insurance. Can you help with a donation; can I mail you out an envelope?" (Dkt. No. 229 at 23).

Legacy's training document on script delivery provided in relevant part that,

> If you focus on each call, and you listen emphatically to the other person, not just what they say but how they say it, you will realize that you can tell which people you should spend your time with (which will give). Remember, 85% of the people you talk to will not give. If you listen emphatically . . . you can weed out these 85% quicker than you are now.

MEMORANDUM OPINION - 8

> This really is 85% of your job: determining who will not give and focusing on those who will.

(Dkt. No. 228 at 74-75) (internal emphases omitted).

Paton asserts that during its years of operation, BCPF contacted over 11,555,121 women to educate, refer to low cost mammography providers, and fundraise. (Dkt. No. 152 at 3). He asserts that after a conversation with a live telephone agent, approximately 1500 women per month without insurance learned about and were referred to a clinic that provided free mammograms. (Dkt. No. 152 at 3, Dkt. No. 204 at 3).

### 3. **Donor Cards**

Once a pledge was made orally on the phone, Legacy sent out a fulfillment pledge card to the donor ("**donor cards**"). Multiple versions of donor cards were used over the years, and numerous samples appear in the record. (*See* Dkt. No. 228 at 7-33 (demonstrative exhibit); *see supra* n. 4). Some were produced by Paton. (Dkt. No. 228 at 62-67). Some were attached to correspondence sent by Paton. (Dkt. No. 230 at 12). Some were produced by donors who had kept copies for their records. (Dkt. No. 161-6 at 5-6; Dkt. No. 161-12 at 5-9). Finally, a former telemarketer provided copies of the donor cards she had used in the course of her work. (Dkt. No. 229 at 15-17)

The donor cards were delivered to donors in envelopes proclaiming to be from the Breast Cancer Prevention Fund, with no mention of Legacy. (*See* Dkt. No. 229 at 19). The envelopes contained a large logo with the name, Breast Cancer Prevention Fund. (*See Id.*). The donor cards themselves also made no mention of Legacy. (*See e.g.,* Dkt. No. 228 at 9, 16, 18, 23, 31). The donor cards were printed on BCPF letterhead, and provided BCPF's website address and nonprofit tax ID number. (*See Id.*). They were usually signed by the individual Legacy telemarketer who had made the solicitation with the title "fundraising coordinator" or "outreach specialist" - but without disclosing that person's role with Legacy or Legacy's status as a paid fundraiser. (*See e.g.,* Dkt. No. 228 at 15-16, 32-33). The detachable

MEMORANDUM OPINION - 9

portion of the donor card that was to be torn off and returned with a donation, provided that donations should be returned to "Breast Cancer Prevention Fund," and then provided an address. (*See e.g.,* Dkt. No. 228 at 9, 16, 18, 23, 31).

On the detachable portion of the donor card some but not all of the donor cards stated "Fundraising provided by LTC." (*See e.g.* Dkt. No. 228 at 9, 16, 31 (donor cards referencing LTC); Dkt. No. 228 at 18, 23 (donor cards fail to reference Legacy or even LTC). Legacy asserts the detachable portion of the donor card was a good place to disclose "LTC," because this is where the donor actually had to write in information and therefore would be most likely to see it. However, the print was extremely small and the acronym "LTC" is vague.

Some of the donor cards gave a dollar figure followed by a parenthetical suggesting that the money donated would be used to pay for the named services, such as:

    _____$25.00   _____$45 Shared Mammogram,

    _____$50.00   _____$90 (One Mammogram), or

    _____$90  _____$180.00 (Two Mammograms).

(*See e.g.*, Dkt. No. 228 at 9, 16, 18)

When potential donors did not timely return the donor cards with a donation, Legacy employees followed up with reminder cards that were substantively similar to the donor cards (the "**reminder cards**"). (*See e.g.* Dkt. No. 228 at 31, 65-67).

Legacy's billing records establish that from July 2011 through BCPF's July 2013 bankruptcy, BCPF distributed at least 202,470 initial pledge cards and 190,649 reminder cards. (Dkt. No. 228 at 48). Paton asserts that BCPF raised only 25-30% of its funds from Washington donors; the other approximately 75% was from out of state. (Dkt. No. 152 at 2).

MEMORANDUM OPINION - 10

**E.**    <u>Clark Nuber and Form 990s</u>

Clark Nuber prepared BCPF's non-profit entity IRS Form 990s from 2006 to 2012. (Dkt. No. 204-1 to 204-7). Clark Nuber also annually assisted BCPF with filing its Charitable Organization Registration with the Washington Secretary of State. (Dkt. No. 204 at 14; Dkt. No. 204-28 to 204-32).

At the bottom of the Form 990 is a place for the tax preparer to mark whether the charity is following SOP 98-2, a guideline established by the American Institute of Certified Public Accountants (AICPA) related to joint cost accounting. After reviewing the information provided to Clark Nuber by BCPF and Paton, Clark Nuber advised BCPF in 2006 and every year thereafter that BCPF was properly following SOP 98-2 and included that indication on BCPF's Form 990s.

On BCPF's Form 990s for years 2005-2010, the percentage BCPF allocated to "program services" had been hovering between 87% and 93%. (*See* Dkt. No 204-6 at 12 (2010), Dkt. No. 204-5 at 12 (2009), Dkt. No. 204-4 at 12 (2008), Dkt. No. 204-3 at 3 (2007), Dkt. No. 204-2 at 3 (2006), Dkt. No. 204-1 at 3 (2005)). On BCPF's 2011 Form 990, Clark Nuber significantly decreased the amount allocated program services, to 52%. (See Dkt. No. 204-7 at 12 (2011). The AG asserts that Clark Nuber's significant adjustment to the amount allocated to program services was made in response to considerations regarding BCPF's practice of calling prior donors.[5] (*See* Dkt. No. 228 at 105-08, 115-18). Although the record is clear that calls to prior donors may have impacted the significant downward adjustment, I cannot conclude on this record that this was the primary reason for the adjustment. (*See Id.*).

Notably, Judge Lasnik recently ruled that BCPF misused the joint cost accounting rule during the relevant time frame. He ruled that although the BCPF-Legacy Contract was drafted as a fee-per-service

---

[5] Calls to prior donors are pure fundraising expenses that do not qualify for joint cost treatment.

MEMORANDUM OPINION - 11

contract, because Legacy always received a percentage of the money, BCPF was not entitled to use joint cost accounting. (Dkt. No. 228 at 88-95).

The Form 990s prepared by Clark Nuber also disclosed that (i) Paton was the Director of BCPF; (ii) BCPF employed Legacy to fundraise; and (iii) Paton's ownership of Legacy. (*See* Dkt. 204-1 to 204-7).

The Form 990s were posted on BCPF's website. (*See* Dkt. 204 at 2).[6]

**F.    Secretary of State**

The Charities Division of the Secretary of State (the "**SOS**") is responsible for overseeing registrations and renewals for Washington charities. As to charitable solicitations, the SOS is generally not an enforcement agency. (*See* RCW 19.09.279; Dkt. No. 292-4 at 16). Instead, SOS staff refer complaints and compliance issues to the AG's Office. (*See Id.*).

Tabatha Blacksmith ("**Blacksmith**"), a senior customer service representative at SOS, described her duties in 2007 as follows:

> [E]ssentially we reviewed documents for compliance with the RCW, so the statute and rule, we assist customers on the phone, by e-mail, and in person, filing their documents. If they have questions about their requirements or how to review forms, and we review those. We enter them into a data base, and then we make that information available to the public so that donors can get that information when they're asked to donate to organizations.

(Dkt. No. 292-1 at 7-8).

Rebecca Sherrell ("**Sherrell**"), currently the Charities Program Liaison between the AG's Consumer Protection Division and the SOS, was the Charities Program Manager at the SOS in 2007. (Dkt. No. 292-4 at 5). She explained that in 2007, the SOS "wanted to make sure that accurate

---

[6] An AG investigator noted that despite visiting BCPF's website numerous times, in 2011 and 2013, BCPF's 2011 Form 990 was not posted on any of her visits to the website. (Dkt. No. 229 at 2).

MEMORANDUM OPINION - 12

information was being provided, so whether it was joint cost allocations, or whether it was bad math, . . . [the] financial section was being looked at to make sure [it did not contain] any glaring errors." (*Id.* at 6, 13). At that time, customer service representatives had the authority to reject charities' filings if they believed they were incomplete or inaccurate. (*Id.* at 15). If a filing was rejected, the charity had 30 days to fix the problem. (*Id.* at 16). If the problem was not remedied within 30 days, the SOS gave the charity an additional 15 days, and then referred the matter to the AG. (*Id.*).

In particular, in 2007, joint cost accounting was a topic of concern because it was becoming apparent that charities were "using this as a way of attributing costs in a manner that probably wasn't true." (*Id.* at 5-6, 13). The Charities Division began "flag[ging] charities that had . . . professional fundraising costs booked as program services at a high percentage." (*Id.* at 10). Blacksmith took a particular interest in the misuse of joint cost accounting.[7] (Dkt. No. 292-1 at 8). She consulted with charities programs and colleagues nationwide (Dkt. No. 292-4 at 11; Dkt. No. 292-1 at 9-10), and inquired with three Washington charities as to how they substantiated their program services allocations on their renewal forms. (Dkt. No. 292-4 at 8; Dkt. No. 292-1 at 8, 13). Her goal was to increase the accuracy of the financial reporting. (Dkt. No. 292-1 at 10).

Around mid-2007, Blacksmith inquired into BCPF's joint cost allocation, seeking to understand BCPF's methodology in allocating fundraising expenses to program services. (*Id.* at 10-13). On July 10, 2007, Paton forwarded a 2005 telemarketing script to Blacksmith, indicating that if she reviewed the script she would "understand what we are trying to accomplish." (Dkt. No. 247-1 at 5). Through an exchange of emails, Blacksmith reiterated Washington's statutory disclosure requirements for charities,

---

[7] Blacksmith was a long-time employee of the Charities Division, since 1995. In 2007, Blacksmith was either a Level 2 or 3 customer service representative. (Dkt. No. 292-1 at 6).

MEMORANDUM OPINION - 13

and offered a number of suggestions on how to improve BCPF's / Legacy's script and disclosures. (*See generally* Dkt. No. 247-1). She requested that BCPF / Legacy amend its script. (*Id.* at 10).

On July 24, 2007, Blacksmith stated

> After reviewing all the information that you provided, we have concluded that [BCPF] qualifies for joint cost allocation under SOP 98-2. . . . Our next step is to determine if the amount of funds that BCPF allocated to program services (as opposed to fundraising or other administrative costs) is appropriate. Despite repeated requests for copies of written materials, the only documentation that BCPF has provided to date to support their allocations is the telephone script. As a result, our determination is based solely on the telephone script and a review of BCPF's 2006 IRS Form 990 federal tax return.

(*Id.* at 22). Blacksmith suggested that based on her methodology of counting words in the script, 27% should be allocated to fundraising/ administrative costs, and 73% to program services. (*See Id.*).

Also on July 24, 2007, Blacksmith noted that the script contained the statement: "We also pay for mammograms for uninsured women," and suggested that while the statement may be true indirectly, it gave "the false impression that BCPF directly pays for mammograms." (*Id.* at 10). She further noted that,

> We have received a number of calls from potential donors who erroneously believe that BCPF directly pays for mammograms. To reduce donor confusion, we recommend that you consider amending your script to state that BCPF "subsidizes the funding of mammograms" or something to that effect.

(*Id.*).

Paton and Cunningham made revisions to the script. (Dkt. No. 247-1 at 14-15). On July 26, 2007, Blacksmith indicated, albeit equivocally, that she was satisfied with the responses she had received from Paton and Cunningham. (*See Id.* at 14). She stated that the script "seems to include the necessary disclosures," and that her "questions regarding disclosure requirements appear to be resolved based on the information provided." (*Id.*). On August 2, 2017, Blacksmith again followed up with

MEMORANDUM OPINION - 14

Cunningham regarding the necessity that Legacy identify itself to each person they interacted with during a telephone call. (*Id.* at 18). She stated that "[r]epeating the first sentence of the script to the women of the household (if different than the person who answers the phone) would satisfy this requirement." (*Id.*). She again requested a revision to the script. (*Id.*)

On August 2, 2007, Blacksmith color-coded the script to explain her methodology, and noted that Cunningham had recently sent her a different version of the script. (*See Id.* at 25). Acknowledging the limitations of her word-counting methodology, Blacksmith queried whether "there might be a better method available to help determine a fair and more accurate joint cost allocation in the future," and suggested a time methodology may be superior. (*Id.*). Paton responded with correspondence from Clark Nuber indicating that BCPF's methodology was "somewhat aggressive, but not unreasonable," and stated that he did not want to "incur the costs to amend a return if it is not absolutely necessary." (*Id.* at 30).

In reply, Blacksmith stated:

> I'm not an accountant, so my suggestions are those of a lay person. If your accountants advise you that tracking time is not an acceptable approach . . . , then by all means please follow the advice of your accountants. . . . All I can suggest is that you discuss it with your accountant and the IRS to determine what path to take in the future. . . . I completely understand your hesitance to incur the cost of an amended federal return. I would recommend discussing the matter with your accountants/advisors and the IRS. If it is determined that an amended 2006 Form 990 is not warranted, please be sure to include a cover letter with BCPF's amended 2006 "Solicitation Report" stating that the 990 was not amended so I will know why the figures on the 990 and the Solicitation Report differ.

(*Id.*).

On August 7, 2007, Paton sought Blacksmith's "feedback on changing some of the BCPF telephone script terminology to be more in line with your suggestions." (*Id.* at 34-35). On August 8, 2007, Blacksmith responded that,

MEMORANDUM OPINION - 15

> [O]ur office cannot give legal advice but I can tell you if the changes to BCPF's telephone script meet our disclosure requirements and would be happy to provide feedback/comments. Your accountant will of course still need to be the one to address whether or not they meet AICPA/SOP 98-2 guidelines.

(*Id.* at 34).

On August 16, 2007, Paton thanked Blacksmith for her time on the telephone and attached an edited script. (*Id.* at 42). Blacksmith responded that, based on her calculations, the total allocable to program services was 65%. (*Id.* at 42). On August 24, 2007, in an email to Cunningham, Blacksmith indicated that, based on her calculations, the total allocable to program services was 83%. (*Id.* at 42).

On September 9, 2007, Paton advised Blacksmith that he was having difficulty completing the forms required by the SOS (*Id.* at 50). He proposed an alternate methodology to calculate the total allocable to program services, but ultimately suggested using the figures from the Form 990s. (*Id.*). On September 13, 2007, Blacksmith acknowledged that the "method of calculation I mentioned earlier seems rather complicated," and then proposed a "less complicated" approach. (*Id.* at 60). Blacksmith indicated that, based on her new calculations, 86% was allocable to program services. (*Id.*).

Sherrell, Blacksmith's supervisor in 2007, was surprised by the degree to which Blacksmith undertook her inquiries into BCPF's joint cost accounting. (Dkt. No. 292-4 at 7). It was a "shock" to Sherrell that Blacksmith reviewed BCPF's telemarketing script because Washington law does not request or require review of a charity's scripts. (*See Id.* at 8). Sherrell believed that, at times, Blacksmith offered opinions beyond the scope of her knowledge. (*See Id.* at 10).

Around late 2007, a new director, Pam Floyd, took over at the Charities Division, and clarified the SOS' policy. (*Id.* at 6-7; 27). She explained that the SOS was "ministerial in nature," and its role was not to verify information submitted by charities; "we don't check to make sure anything's correct or added correctly, we take what we get, and we make that available to the public." (Dkt. No. 292-4 at 6).

MEMORANDUM OPINION - 16

The BCPF-Legacy Contract was filed with the SOS every year. (Dkt. 204 at 14; *see also* Dkt. No 204-28 to 204-32). Legacy's annual filings with the SOS disclosed that BCPF was Legacy's only client in Washington after 2006 and that Paton was Legacy's highest paid employee. (Dkt. 204 at 14-15).

## G.   BCPF's Representations Regarding Funds Spent on "Program Services"

BCPF raised $22,763,546 in charitable contributions from 2005 through 2012. (Dkt. No. 198-6 at 102). Of that amount, BCPF paid Legacy $18,613,926 for its telemarketing services. (*Id.*). Thus, BCPF paid Legacy over 80% of the total funds raised on behalf of BCPF. Of that amount, Paton himself took home $8,491,021 -- which amounts to 37% of the total funds raised on behalf of BCPF. (*Id.*). BCPF distributed only $3,820,921 in grants to organizations that provided something other than fundraising calls. (*Id.*). Thus, BCPF donated only about 16.8% of the money to charities that actually provided mammograms. Nevertheless, between 2006 and 2011, BCPF reported on its website, in its IRS filings, and in its other communications that the vast majority of money raised by BCPF went to "program services." (*See* Dkt. No. 204-1 to Dkt. No. 204-7).

On its website, within yearly annual reports, BCPF divided the charity's expenses into three categories – (1) program, (2) management and general, and (3) fundraising. (Dkt. No. 202 at 12-25). Between 2006 and 2011, BCPF represented in these annual reports that 87%-93% of all funds it raised went to its "Program." (Dkt. No. 202 at 13, 16, 19, 23). In reality, over 80% of all funds raised by BCPF were paid to *Legacy* and over a third of the funds that were paid to Legacy then flowed to *Paton*. (*See* Dkt. No. 198-6 at 102). BCPF's website claimed that none of the Board of Directors, including Paton, was compensated for their time. (Dkt. No. 162-1 at 4).

On its website BCPF also displayed colorful pie charts suggesting that BCPF donated the vast majority of the money it raised. (Dkt. No. 202 at 14, 24). BCPF even posted a newspaper article

MEMORANDUM OPINION - 17

comparing charities, touting that BCPF donated 90% of its money to its programs.  *See* Dkt. No. 229 at 2, 6-13).

BCPF made similar representations during the course of its telemarketing campaign through Legacy.  If a consumer asked how much money went to the "cause," telemarketers were instructed to tell donors that for 2010 "88% of donations went to program services."  (Dkt. No. 228 at 71).  Another version of a rebuttal script instructed telemarketers to respond that "[f]or 2005 93% (2006 87%) of all funds went directly to program services.  (The balance is for management & General [sic], and for fundraising.)."  (Dkt. No. 229 at 24).

## H.    Investigation of BCPF and Bankruptcy

Sometime in 2010, Carl Hu contacted, among others, the Washington State AG, the SOS, the IRS, and KOMO News - initiating a "whistleblower campaign" against BCPF.  (*See* Dkt. No. 152 at 6). In May 2011, the AG began investigating BCPF for possible violations of Washington's Consumer Protection and Charitable Solicitation Acts.  (Dkt. No. 229 at 1-2).

KOMO News aired an "expose" on BCPF, Paton, and Legacy featuring Legacy employees in November 2011. (Dkt. No. 152 at 7; Dkt. No. 207 at 5).  Paton resigned from the Board of BCPF in October 2011.  (Dkt. No. 152 at 6; Dkt. No. 204 at 3).  BCPF continued to operate.  (Dkt. No. 204 at 3). The AG ultimately investigated BCPF, and in March 2013 proposed a consent order of payment of $559,272.  BCPF did not accept the offer and attempted to negotiate with the AG.  (Dkt. No. 152 at 7).

BCPF filed its Chapter 7 bankruptcy petition on July 2, 2013.  (Dkt. No. 1).  On October 30, 2013, the AG filed a claim against the bankruptcy estate of BCPF in the amount of $20,280,512 (Claim 5-1), alleging that BCPF's activities violated the Charitable Solicitations Act, RCW 19.09.020 et seq., and the Consumer Protection Act, RCW 19.86.020 et seq.  Legacy ceased operations sometime around

MEMORANDUM OPINION - 18

the third quarter of 2014. (Dkt. No. 198-1 at 52). The AG amended its proof of claim on February 18, 2015. (Claim 5-2).

## III.  __ANALYSIS__

The Trustee seeks an order allowing a portion of the AG's claim in the amount of $7,616,389, on the basis that BCPF is liable for (a) BCPF's breach of the fiduciary duty of loyalty and (b) Paton's breach of the fiduciary duty of loyalty.

The AG seeks an order allowing a portion of its claim for restitution, in the amount of $18,942,625, based on violations of Washington's Charitable Solicitation Act (CSA) and Consumer Protection Act (CPA). First, the AG asserts that BCPF's pledge cards violated the CSA and CPA by failing to comply with solicitation disclosure requirements, and seeks to establish at least 1,179,357 violations of the CSA and CPA.[8] Second, the AG asserts that BCPF's allocation of expenses between fundraising, administrative, and program services constituted an unfair or deceptive practice under the CPA. Third, the AG asserts that BCPF's telephonic charitable solicitations – made pursuant to scripts in use from 2005 to August 2010 and from July 2011 to July 2013 – deceptively represented BCPF's charitable purpose. The AG seeks allowance of a portion of its claim for restitution and represents that under the doctrine of *cy pres* it will then distribute the restitution to legitimate charities for the purpose of providing mammograms in each state in which BCPF operated.

---

[8] The AG is not seeking the actual penalties at this time; it only seeks to establish the predicate number of violations.

MEMORANDUM OPINION - 19

## A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A fact is material if it "might affect the outcome of the suit under the governing law."   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a properly supported motion for summary judgment has been presented, the adverse party "may not rest upon the mere allegations or denials of his pleading." *Id.*  Rather, the nonmoving party must set forth specific facts demonstrating the existence of a genuine issue for trial. *Id.*  While all justifiable inferences are to be drawn in favor of the non-moving party, when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *Matsushita Elec. Indus Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations omitted).

## B.  Standing and Remedies

### 1.  AG's standing to assert breach of fiduciary duty of loyalty claims and to seek restitution or disgorgement on behalf of the public

Paton, Legacy, and Clark Nuber assert that the AG does not have standing to seek a monetary remedy for BCPF's asserted breach of its fiduciary duties.  I disagree.

"Since the community is interested in the enforcement of charitable trusts, a suit to enforce a charitable trust can be maintained by the Attorney General of the State in which the charitable trust is to be administered." Restat. 2d of Trusts § 391, Cmt. a (2012).  "It is the attorney general that has the

MEMORANDUM OPINION - 20

authority to represent the public interest in securing the enforcement of charitable trusts." *Lundberg v. Coleman*, 115 Wn.App. 172, 179 (2002).

In Washington, under both statutory and case law authority, the AG is empowered to institute actions to protect the public interest. The Washington Supreme Court has held that "the Attorney General, as representative of the public and particularly of those individuals who may be specially benefited, has standing to maintain an action against the trustees of a charitable trust." *State v. Taylor*, 58 Wn. 2d 252, 261 (1961). Likewise, RCW 11.110.120 provides that the AG "may institute appropriate proceedings to secure compliance with [the Charitable Trusts Statute] and to secure the proper administration of any trust or other relationship to which [it] applies."

Here, BCPF was domiciled in Washington, conducted business in Washington, and funds were solicited by Legacy through operations in Washington. Donations were deposited in and administered from Washington. The charitable trust (see infra) was located in Washington. Therefore, the Washington AG has standing to represent the public interest in securing the enforcement of this charitable trust.

Paton, Legacy, and Clark Nuber attempt to distinguish the AG's request for a monetary remedy from an action "securing compliance," "securing administration," or "enforcing" a charitable trust. They in effect assert that because a monetary remedy is not expressly authorized, a monetary remedy is not recoverable. However, neither the applicable statute nor case law so limit the AG's enforcement remedies. In addition, actions for "compliance," administration," or "enforcement" would often be rendered meaningless without the ability to seek some attendant monetary remedy.

Paton and Legacy assert that the Restatement (Second) of Trusts § 392 precludes a monetary remedy. It provides that "[t]he remedies for the failure of the trustees of a charitable trust to perform their duties under the trust are exclusively equitable." Comment a then lists examples of equitable

MEMORANDUM OPINION - 21

remedies that would not necessarily involve money. However, neither the text of the section nor the comment preclude monetary equitable remedies, such as restitution or disgorgement, where appropriate to "redress a breach of trust." *See* cmt. a. Moreover, the Restatement (Third) of Trusts § 100 expressly indicates that remedies for breach of trust may result in a monetary award. It provides that,

> A trustee who commits a breach of trust is chargeable with
>
> (a) the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or
>
> (b) the amount of any benefit to the trustee personally as a result of the breach.

Notably, subpart (b) essentially codifies the remedies of restitution and disgorgement. In addition, the comments to the section provide that the "goal of making the trust and beneficiaries whole is not always taken literally, however, either as a floor or as a ceiling." *See* Cmt. a. In some cases even *punitive* damages are permissible – "especially so if the trustee has acted maliciously, in bad faith, or in a fraudulent, particularly reckless, or self-serving manner." *See* Cmts. a and d.

Based on the above, I conclude that the AG is entitled to assert its breach of fiduciary duty of loyalty claims and to seek restitution or disgorgement on behalf of the public.

## 2. **AG's standing to assert claims under the CSA and CPA and to seek restitution on behalf of the public**

The AG asserts claims under RCW 19.09.340 (CSA), 19.86.080 (CPA), and 19.86.140 (CPA), and seeks restitution and statutory penalties.

RCW 19.09.340 provides in relevant part that,

> (1) The legislature finds that the practices covered by this chapter are matters vitally affecting the public interest for the purpose of applying the [CPA]. A violation of this chapter is not reasonable in relation to the development and preservation of business and is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the [CPA].

MEMORANDUM OPINION - 22

> (2) The secretary may refer such evidence, as may be available, concerning violations of [the CSA] to the attorney general . . . In addition to any other action they might commence, the attorney general . . . may bring an action in the name of the state, with or without such reference, against any entity to restrain and prevent the doing of any act or practice prohibited by [the CSA]: PROVIDED, That [the CSA] shall be considered in conjunction with . . . [the CPA], as now or hereafter amended, and the powers and duties of the attorney general . . . as they may appear in the [the CPA], shall apply against all entities subject to [the CSA].

RCW 19.86.080 provides in relevant part that,

> (1) The attorney general may bring an action in the name of the state, or as parens patriae on behalf of persons residing in the state, against any person to restrain and prevent the doing of any act herein prohibited or declared to be unlawful; and the prevailing party may, in the discretion of the court, recover the costs of said action including a reasonable attorney's fee.

> (2) The court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any act herein prohibited or declared to be unlawful.

RCW 19.86.140 provides in relevant part that "[e]very person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more than two thousand dollars for each violation." A "person" includes corporations, trusts, unincorporated associations and partnerships. *See* RCW 19.86.010.

Paton and Legacy argue that under RCW 19.86.080 the AG does not have authority to seek restitution under the CPA because the AG did not file a predicate injunctive action. RCW 19.86.080(1) provides that the AG may bring an action "to *restrain and prevent* the doing of any act prohibited or declared to be unlawful" and the prevailing party may recover costs and attorneys' fees. RCW 19.86.080(2) provides that the "court may make such *additional* orders or judgments as may be necessary to restore to any person in interest any moneys or property . . . " Paton, Legacy, and Clark Nuber assert that the word "additional" is meant to require a predicate injunctive action. I disagree. The CPA provides the AG with enforcement authority. The mere inclusion of the word "additional" in the

MEMORANDUM OPINION - 23

listing of equitable relief the AG may seek in enforcement of the CPA should not be interpreted as requiring a request for injunctive relief as a necessary prerequisite to asserting a claim in bankruptcy for other equitable remedies.

The Washington Supreme Court has indicated that the issuance of an injunction is not necessary for the AG to ultimately obtain restitution. *See State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 82 Wn.2d 265 (1973). In *Ralph Williams,* the AG brought a lawsuit under the CPA seeking injunctive relief, civil penalties and restitution. The injunctive action was effectively mooted when the car dealership closed. Nevertheless, the Supreme Court permitted the claim for penalties and restitution to proceed. *See Id.*

It would not effectuate the broad purposes of the CPA to limit relief to situations in which an injunctive action is filed. This is particularly true in situations in which an injunctive action would be futile – such as a closed business. In the bankruptcy context -- where a closed company is put in the hands of a trustee, is not operating in any manner, and will not operate again -- an injunctive action would serve no purpose. Moreover, any request for injunctive relief would be instituted in a lawsuit, not through a claims process. Although conceptually the AG could institute a lawsuit seeking injunctive relief even now, this would be a pointless exercise with a chapter 7 debtor corporation and is not necessitated by the statute.

### 3. Lack of limitation on AG authority to obtain monetary remedies based on conduct affecting non-residents

Paton, Legacy, and Clark Nuber assert the AG's authority to recover damages for breach of the fiduciary duty of loyalty is limited to damages suffered by Washington residents. Similarly, they assert that the AG's ability to recover restitution for violation of the CSA and CPA is limited only to Washington residents. I disagree on both accounts.

MEMORANDUM OPINION - 24

### a.  Breach of the Fiduciary Duty of Loyalty

Neither the Charitable Trusts Statute nor case law limits the AG's right to monetary remedies for breach of the duty of loyalty affecting non-residents.

If a trust is "administered in a particular state, that state has jurisdiction to determine through its courts not only the interests of the beneficiaries in the trust property but also the liabilities of the trustee to the beneficiaries, even though it does not have jurisdiction over the beneficiaries, or some of them." *See* Restat. 2d of Conflict of Laws, § 267, Cmt. d (2nd 1988); *see also Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950) (noting that "the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or non-resident").  Absent an express limitation, the AG should not be arbitrarily constrained in its ability to seek monetary remedies for breach of a charitable trust that is located in Washington.

### b.  The CSA and CPA

Likewise, neither statutes nor case law limits the AG's ability to obtain monetary remedies for breach of the CSA or CPA to damages caused to Washington residents.

The CPA is a regulatory statute intended to protect consumers.  It prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* RCW 19.86.020.  "Commerce" includes "any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2).  "In order to give effect to the phrase 'indirectly affecting,' claims are not limited to those having only a direct affect" on the people of Washington. *See Thornell v. Seattle Serv. Bureau, Inc.*, 184 Wash.2d 793, 800 (2015).  The purpose of the statute is "not only to protect the public but also, and distinctly, to foster fair and honest competition." *Id.* (internal quotes

MEMORANDUM OPINION - 25

omitted). Washington's citizens are both directly and indirectly affected when a Washington charity is held accountable for operating fairly and within the bounds of the law. "The commerce and trade that [an] abusive company brings into Washington . . . affects the state economy and thus affects the Washington public at large." *Id.* at 801 (internal marks omitted). The CPA is to be "liberally construed that its beneficial purposes may be served." *See* RCW 19.86.920; *see also Ralph Williams,* 82 Wash.2d at 277-78 (endorsing a "liberal construction" of RCW 19.86.080 and "declin[ing] to limit the traditional equity powers of the court").

Second, although the Washington Supreme Court has not yet specifically addressed whether the AG may invoke the CPA on behalf of non-Washington residents, it has repeatedly confirmed the CPA's extraterritorial reach. The Washington Supreme Court "rejected an interpretation of [the CPA] that would have limited the applicability of the CPA to prohibit unfair and deceptive practices to Washington's borders." *Thornell*, 184 Wash.2d at 801 (referencing *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 279-80 (1972)). In *Thornell*, the Supreme Court upheld an out-of-state plaintiff's use of the CPA to pursue a Washington corporation for allegedly deceptive acts. *See* 184 Wash.2d at 796. It also upheld an out-of-state plaintiff's use of the CPA to pursue an out-of-state defendant for the allegedly deceptive acts of its Washington agent. *See Id.* In other words, when acts violating the CPA occur in the state of Washington, the reach of the CPA is not limited to damages caused to Washington residents. Paton and Legacy cite the language in 19.86.080(1) stating that the "attorney general may bring an action in the name of the state, or as parens patriae on behalf of persons residing in the state," and then conclude that this precludes recovery on behalf of non-Washington residents. However, their interpretation ignores critical language in the second subpart of the statute. RCW 19.86.080(2) permits a court to "restore to *any person* in interest any moneys or property . . . which may have been acquired by means of any act herein prohibited or declared to be unlawful." Regardless of the type of predicate

MEMORANDUM OPINION - 26

action brought by the AG, there is nothing in the statute preventing application of the broad language "any person" to encompass actions involving non-Washington residents.

**C. Statutes of Limitations**

**1. Statute of limitations for AG's breach of fiduciary duty of loyalty claims**

Paton and Legacy assert that the AG's breach of fiduciary duty claims are barred by a statute of limitations. However, at common law, a statute of limitation does not run against the State. *See State v. LG Elecs., Inc.*, 186 Wn.2d 1, 12 (2016). This principle was codified in RCW 4.16.160, which provides that "there shall be no limitation to actions brought in the name of or for the benefit of state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state." Courts have interpreted this to exempt the State from the statute of limitations when the State acts for the public good. *See LG Elecs., Inc.*, 186 Wn.2d at 14-15. Therefore, I conclude that there is no statute of limitations applicable to the AG pursuing breach of fiduciary claims on behalf of the public.

**2. Statute of limitations for AG's CPA penalties claims**

A statute of limitations expressly applies to the AG in seeking penalties under the CPA. The AG must bring any "action upon a statute for a . . . penalty to the state" within two years. *See* RCW 4.16.100. Here, the AG has asserted it will seek penalties for violations of the CSA and CPA occurring from July 2011 through March 2013. The AG selected the cut-off date of July 2011 because it is two years prior to the date of BCPF's bankruptcy, which tolled the statute of limitations on claims against BCPF.

Legacy and Paton assert that the AG's request for penalties was brought too late, in violation of RCW 4.16.100, because the "AG received notice as early as May 11, 2011, via the complaint from Carl Hu, regarding BCPF's 'defective' pledge card." Legacy and Paton's argument is inapposite because the

MEMORANDUM OPINION - 27

AG is not relying on the discovery rule[9] to assert its statutory claims.  Here the statutory violations were ongoing throughout the relevant period.   The limitations period runs separately as to each violation. Therefore, I conclude that the AG has properly calculated the relevant statute of limitations for seeking penalties for violation of the CPA.

**D.**     **Charitable Trust Claims**

    **1.**   **Common law of charitable trusts**

       A trust "is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it *for the benefit of charity* or for one or more persons, at least one of whom is not the sole trustee."  Restat. 3d of Trusts, § 2 (2012) (emphasis added).  Washington courts look to the Restatement of Trusts as persuasive authority.  *See e.g. In re Wash. Builders Benefit Tr.*, 173 Wn. App. 34, 71-72 (2013).

       A trust may be created by a transfer *inter vivos* by a property owner to another person as trustee for one or more persons.  Restat. 3d of Trusts, § 10(b).  "Except as required by a statute of frauds, a writing is not necessary to create an enforceable *inter vivos* trust, whether by declaration, by transfer to another trustee, or by contract."  *Id.* at § 20. Washington law expressly provides that trusts can be created orally.  RCW 11.98.014.  Alternatively, a trust may be created when an owner of property declares that he or she holds property for the benefit of others.  Restat. 3d of Trusts §10 (c).

       A corporation has the capacity to take and hold property in trust and act as trustee.  *See*

---

[9] Under the discovery rule "a cause of action accrues when the plaintiff knew, or through exercise of due diligence should have known the essential elements of the cause of action."  *Allen v. State*, 118 Wn.2d 753, 757-58 (1992).

MEMORANDUM OPINION - 28

Restat. 3d of Trusts, § 33(1). "If property is transferred to a corporation in trust for a purpose germane to the purpose for which the corporation is created, it has capacity to administer the trust." *Id.* at § 33 Cmt. b.

### 2. <u>Washington's Charitable Trusts Statute</u>

Washington's Charitable Trusts Statute, RCW 11.110 *et seq.,* is intended to

> facilitate public supervision over the administration of public charitable trusts and similar relationships and to clarify and implement the powers and duties of the attorney general and the secretary of state with relation thereto.

RCW 11.110.010. The statute does not define what constitutes a "charitable trust." *See* RCW 11.110 *et seq.* However, the Washington Administrative Code defines a "charitable trust" to mean

> any real or personal property right held by an entity or person that is intended to be used for a charitable purpose(s). The trust may be created by will, deed, articles of incorporation, or other governing instrument. It may be express or constructive.

WAC 434-120-025.

A "trustee" of a charitable trust means "any person holding property in trust for a public charitable purpose" and "a corporation formed for the administration of a charitable trust or holding assets subject to limitations permitting their use only for charitable . . . purposes." *See* RCW 11.110.020.[10]

The AG's office "may institute appropriate proceedings to secure compliance with [the Charitable Trusts Statute] and to secure the proper administration of any trust or other relationship to which [it] applies." *See* RCW 11.110.120.

---

[10] The definition of "person" explicitly applies to individuals, organizations, groups, associations, partnerships, corporations, or any combination of these. *See* RCW 11.110.020.

MEMORANDUM OPINION - 29

### 3. <u>Existence of a charitable trust</u>

Under both statutory and case law, the corpus of donations solicited on behalf of BCPF constituted a charitable trust. When the individual donors transferred their property to BCPF, BCPF took the donations in a fiduciary capacity, in trust, for the beneficiaries. Notably, WAC 434-120-025 provides that a charitable trust may be created by articles of incorporation or other governing instruments.[11] BCPF's articles of incorporation provided in relevant part:

> The purpose for which the corporation is formed is: promoting prevention and early detection of breast cancer, encouraging breast-self exams, providing funds to pay for mammograms for uninsured women, raise awareness and educate the general public about breast cancer, and providing funding for breast cancer research.

BCPF's bylaws provided in relevant part: "[t]he specific objectives and purposes of this corporation shall be: Public Benefit Corporation – (charitable purpose)." BCPF also represented, on its website and in its public government filings, that it was holding and administering the donations for a public charitable purpose. These various statements of purpose by BCPF are consistent with the creation of a charitable trust for donations made to BCPF.

Clark Nuber asserts the existence of a charitable trust is disputed because BCPF's articles of incorporation do not reference RCW 11.110 or include the words "public charitable purpose." However, Washington law has no requirement to reference RCW 11.110 or to include any particular language, and WAC 434-120-025 provides that a charitable trust may be express or constructive. Similarly, the Restatement provides that "[n]o particular form of words or conduct is necessary for the manifestation of intention to create a charitable trust." Restat. 2d of Trusts, § 351 Cmt. b. "A charitable trust may be created although the settlor does not use the word 'trust' or 'trustee.'" *Id.*

---

[11] Although WACs are not themselves binding authority, the WAC definition of "charitable trust" is consistent with the RCW 11.110.020 definition of "trustee."

MEMORANDUM OPINION - 30

Indeed, the scope of the charitable purpose for which the funds were donated is disputed. The Trustee and AG assert that donors intended for all or substantially all of the donated funds to pay for mammograms for uninsured women. Legacy, Paton, and Clark Nuber assert that the intended charitable purpose was much broader, encompassing not only mammograms, but also outreach, education, and referrals. Regardless, the donated funds were held in trust for *some* public charitable purpose.

### 4. BCPF as trustee of the charitable trust comprised of donations made to BCPF

BCPF was the trustee of the charitable trust comprised of donations made to BCPF because it held the donations intended by donors to be used for a charitable purpose.

It is irrelevant that BCPF did not register as a trustee under RCW 11.110.020, as it did not meet the requirements of a trustee that needed to register. A trustee, as defined by RCW 11.110.020, must register with the SOS under certain conditions, none of which have been shown to apply to BCPF *See* RCW 11.110.051(1). Moreover, even if BCPF should have registered as a trustee, it would be illogical for a trustee to be able to avoid application of the entire statute merely by failing to register.

### 5. Inability to conclude Paton was a trustee of the charitable trust

The Trustee argued that Paton was a trustee of the charitable trust along with BCPF. The Trustee further argued that because they were co-trustees, BCPF would be co-liable for Paton's breaches of the fiduciary duty of loyalty. However, the authority cited by the Trustee was inapposite and did not demonstrate that Paton's position as President and/or Director of BCPF also rendered him a co-trustee of the charitable trust.[12] On this record, I cannot conclude whether Paton was a co-trustee of the charitable trust. Therefore, I do not reach the issue of asserted co-liability.

---

[12] Comment b to the Restatement (Second) of Trusts, § 379 merely analogizes the role of the trustees or directors of a charitable corporation to the role of the trustees of a charitable trust. It does not state that individual directors of a corporate trustee are co-trustees with the corporate trustee.

MEMORANDUM OPINION - 31

### 6. <u>Fiduciary duty of loyalty</u>

The existence of a legal duty is a question of law. *See e.g., Alexander v. Sanford*, 181 Wn. App. 135, 170 (2014). "[I]t appears to be generally recognized that the duties of the trustee of a charitable trust are substantially the same as those of the trustee of a private trust." *Taylor*, 58 Wn.2d at 257 (citing cases).

Prior to 2011, Washington courts depended on the common law to define a trustee's duty of loyalty. *See* Karen. E. Boxx and Katie S. Groblewski, *Washington Trust Laws' Extreme Makeover: Blending with the Uniform Trust Code and Taking Reform Further with Innovations in Notice, Situs, and Representation*, 88 Wash. L. Rev. 813, 878 (Oct. 2013).

As stated above, Washington courts look to the Restatement of Trusts as persuasive authority. *See e.g. In re Guardianship of Eisenberg*, 43 Wn.App. 761, 766-68 (1986) (referencing the Restatement (Second) of Trusts to define a trustee's duties); *Wash. Builders Benefit Tr.*, 173 Wn. App. at 71-72 (referencing the Restatement (Third) of Trusts to define a trustee's duties). The Restatement (Third) of Trusts provides:

> § 78. Duty of Loyalty
>
> (1) Except as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust solely in the interest of the beneficiaries, or solely in furtherance of its charitable purpose.
>
> (2) Except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests.
>
> (3) Whether acting in a fiduciary or personal capacity, a trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter.

As explained by Boxx and Groblewski,

MEMORANDUM OPINION - 32

> [t]he duty of loyalty prohibits the trustee from self-dealing, which is transacting in her individual capacity with the trust, or entering into transactions where the trustee is not directly dealing with the trust, but nevertheless has a conflict of interest. If a trustee breaches her duty of loyalty by self-dealing, there is no further inquiry and the transaction is voidable by the beneficiaries regardless of the fairness of the transaction.

88 Wash. L. Rev. at 878. This is referred to as the "no further inquiry" rule. *See Id.* The standard is strict.

> [U]nder this rule, a trustee who has violated the duty of loyalty is liable without further inquiry into whether the breach has resulted in any actual benefit to the trustee, whether the trustee has acted in good faith, whether the transaction was fair, or even, in some cases, whether the breach has caused any actual harm to either the trust or its beneficiaries.

*Id.* at 878-79 (citing 3 Austin Wakeman Scott *et al.*, <u>Scott and Ascher on Trusts</u> § 17.2, at 1080 (4th ed. 2006)).

Commentators have further expressed that when a transaction does not rise to the level of a direct conflict of interest or self-dealing, it may nonetheless create a conflict or potential conflict that is problematic. Although articulated in different ways, it is clear that further inquiry is required into the transaction and relationships between the parties.

Further inquiry may be required to determine if the nature of the relationship(s) between the parties is close enough to adversely influence the trustee's fiduciary decision-making judgment. As provided in the Restatement,

> [A] trustee must refrain, whether in fiduciary or personal dealings with third parties, from transactions in which it is reasonably foreseeable that the trustee's future fiduciary conduct might be influenced by considerations other than the best interests of the beneficiaries.

§ 78 Cmt. b. Except under certain circumstances,

> [t]he duty of loyalty prohibits the trustee from engaging in transactions, as trustee, with persons with whom the trustee is closely related or associated. . . .

MEMORANDUM OPINION - 33

> [A] corporate trustee cannot properly engage in a purchase, sale, or other transaction with one of its officers or directors. Although not involving self-dealing . . ., these transactions involve individuals closely associated with a corporate trustee in a manner comparable to family members of an individual trustee.

§ 78 Cmt. e.

> In administering a trust the trustee has a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust. Thus, it is improper for the trustee to . . . engage an agent or advisor for the trust, either for the purpose of benefitting a third person (whether or not a party to the transaction) rather than the trust estate or for the purpose of advancing an objective other than the purposes of the trust.

§ 78 Cmt. f.

In other words, "[a]s the connection becomes less than a complete alter ego, the cases look to whether the common interest is sufficient to affect the trustee's judgment." Karen E. Boxx., *Of Punctilios and Paybacks: The Duty of Loyalty Under the Uniform Trust Code*, 67 Mo. L. Rev. 279, 287 (Spring 2002) (citing 2A Austin Wakeman Scott & William Franklin Fratcher, <u>The Law of Trusts</u> § 170.6 (4th ed. 1987); George Gleason Bogert & George Taylor Bogert, <u>The Law of Trusts and Trustees</u> § 543(A), at 281-82 (2d ed. 1993)).

Alternatively, further inquiry may be required to determine the fairness of the transaction. *See* Boxx, 67 Mo. L. Rev. at 282 ("If the trustee's conflict is not substantial, then the trustee may avoid liability by establishing the fairness of the transaction."). "To be able to defend a transaction on the basis of fairness, under the common law a trustee would have to show that her own interests in the particular transaction were not sufficient to bring it into the zone of self-dealing." Boxx and Groblewski, 88 Wash. L. Rev. at 879.

In 2011, Washington codified a trustee's duties of loyalty in RCW 11.98.078. "In particular, it clarifies what transactions are subject to the no further inquiry rule, and what transactions can be

MEMORANDUM OPINION - 34

Below is a Memorandum Decision of the Court.

defended by a trustee on the basis of fairness." *Id.* at 823-824. RCW 11.98.078 provides in relevant

part that,

> (1) A trustee must administer the trust solely in the interests of the beneficiaries.
> (2) . . . a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:
> (a) The transaction was authorized by the terms of the trust;
> . . .
> (d) The beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with RCW 11.98.108; or
> . . .
> (3)(a) A sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be "otherwise affected" by a conflict between fiduciary and personal interests under this section if it is entered into by the trustee with:
> . . .
> (iii) An agent or attorney of the trustee; or
> (iv) A corporation or other person or enterprise in which the trustee, or a person that owns a significant interest in the trustee, has an interest that might affect the trustee's best judgment.
> (b) The presumption is rebutted if the trustee establishes that the conflict did not adversely affect the interests of the beneficiaries.
> (4) A sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account that is voidable under subsection (2) of this section may be voided by a beneficiary without further proof.

### 7. **Trustee's arguments regarding the duty of loyalty**

First, the Trustee asserts that BCPF breached its fiduciary duty of loyalty by failing to administer the trust solely in the interest of the beneficiaries and solely in furtherance of its charitable purpose. In support, the Trustee argues that Paton always enjoyed 100% of Legacy Telemarketing's profits and was its sole shareholder and that between 2006 and 2011, BCPF constituted 91% (2006), 96% (2007), 97% (2008), 99% (2009), 99% (2010), and 98% (2011) of Legacy's revenues. In other words, "[t]he more money BCPF received in donations, the more money Paton made."

MEMORANDUM OPINION - 35

Second, the Trustee asserts that BCPF breached its fiduciary duty of loyalty by engaging in the fundraising arrangement with Legacy because Legacy's profits flowed solely to Paton, who was BCPF's own President/ Executive Director/ Board Director. The Trustee argues that Paton had an incentive to maximize the amount of donations raised (even if the methodology would ultimately be harmful to donors and beneficiaries) given the existence of the Legacy-BCPF contract and that Paton's compensation through the Legacy was commensurate with the amount of donations.

Finally, the Trustee asserts that BCPF breached its fiduciary duty of loyalty by failing to communicate to its beneficiaries all material facts BCPF knew or should have known in connection with BCPF's operations.[13]

Although the Trustee articulated three separate bases for asserted breach of the fiduciary duty of loyalty, they all revolve around the extent to which Paton benefited or would have been able to benefit under the BCPF-Legacy Contract.

**8**. **BCPF's lack of a direct conflict**

On this record, the Trustee has not established that BCPF had a direct conflict of interest or engaged in direct self-dealing.

First, although Paton was the owner of Legacy and the President and Director of BCPF during much of the relevant time period, Legacy, Paton, and BCPF are technically separate and distinct entities.

---

[13] The Trustee has not demonstrated how the third prong of §78 of the Restatement's articulation of the duty of loyalty would apply in this context. Breast cancer affects not only women diagnosed with cancer, but also their families and loved ones. Thus, the beneficiary of the charitable trust over which BCPF was trustee was the general public. Although it is logical in some contexts for a trustee to have a duty to communicate with trust beneficiaries, it is unclear what duty or practical ability BCPF had to communicate with all members of the general public. BCPF maintained a website and made certain disclosures to the IRS and SOS. Although the general public could have accessed this information, it is unclear that these impersonal disclosures are the kind of information intended to be encompassed by the terminology "all material facts the trustee knows or should know."

MEMORANDUM OPINION - 36

When entering into the BCPF-Legacy Contract, BCPF was contracting with Legacy. BCPF was not directly contracting with one of its directors.

Second, it has not been shown that BCPF *itself* stood to improperly benefit under the BCPF-Legacy Contract. The Trustee has not shown that the BCPF-Legacy Contract was not market rate or that BCPF would have had a substantially different financial arrangement with any other telemarketer. BCPF arguably would have paid the same amount for telemarketing services regardless of who was providing those services.

Third, the Trustee has not shown that BCPF had any particular knowledge of or control over what portion of Legacy's revenue from the BCPF-Legacy Contract flowed to Paton. Paton's sizable compensation generated from Legacy's business with BCPF business is indeed troubling given Paton's relationship with BCPF. However, it does not alone establish that BCPF breached its fiduciary duties as trustee of the charitable trust. Similarly, the Trustee has not shown that BCPF had any control over what proportion of Legacy's business BCPF generated. Although the BCPF-Legacy Contract limited BCPF's ability to engage other fundraisers, it did not limit Legacy's ability to engage other clients.

### 9. **BCPF's possible indirect conflict**

Notwithstanding the lack of a proven direct conflict of interest or direct self-dealing, BCPF may have violated its duty of loyalty by entering into and remaining in a relationship with Legacy. It is quite possible that the relationships between Paton, Legacy, BCPF, and BCPF's other Board members may have prevented BCPF from administering the charitable trust solely in the interest of the beneficiaries or solely in furtherance of its charitable purpose. Unfortunately, to make that determination I must undertake a factually-intensive inquiry not possible solely on the record before me.

It is not sufficiently clear for purposes of summary judgment that the relationships between BCPF, Legacy, and Paton were close enough to potentially or actually taint, or adversely influence,

MEMORANDUM OPINION - 37

BCPF's fiduciary decision-making abilities.  Analysis of the relationships between all of these players requires a factually-intensive inquiry that is better suited to an evidentiary hearing.  For example, what were the details surrounding the selection of BCPF's other directors? What was Paton's ongoing relationship with the other directors?  What did the other directors know about Paton and/or Legacy? What did they know about Paton's compensation?  Did Paton's interlocking relationship with BCPF and Legacy influence the BCPF Board to make particular decisions?  Although it is asserted that BCPF investigated hiring other telemarketers and that Paton recused himself from voting on the BCPF-Legacy Contract, these facts are not conclusive because Paton failed to disclose material information to BCPF's other directors regarding the extent of his personal benefit under the BCPF-Legacy Contract.

In addition, it is unclear whether the BCPF-Legacy contractual relationship was fair -- with "fairness" extending to matters including, but not limited to, the economics of the BCPF-Legacy Contract.  For example, what were the details surrounding the selection of Legacy as BCPF's exclusive telemarketer?  Was it "fair" to the beneficiaries that BCPF decided to use a telemarketer to accomplish its charitable purpose at all?  Could BCPF's goals of outreach, education, and breast cancer prevention have been more effectively accomplished through over avenues?  How were the beneficiaries affected by the BCPF-Legacy Contract?

Moreover, to the extent I consider the BCPF-Legacy relationship as it existed after Washington's codification of the duty of loyalty, I can further consider fairness to the beneficiaries and/or the lack of an adverse effect on beneficiaries' interests under the statutory scheme.  *See* RCW 11.98.078(2)-(3).

In sum, disputed and unknown issues of fact preclude me from determining whether BCPF breached its fiduciary duty of loyalty on summary judgment.[14]

---

[14] Clark Nuber argues that any potential liability for breach of fiduciary duties by BCPF caused by either Legacy or Paton were *ultra vires* actions and would not result in vicarious liability.  As I have not yet determined whether BCPF breached fiduciary duties, this argument is premature.

MEMORANDUM OPINION - 38

### E. Consumer Solicitation Act and Consumer Protection Act Claims

#### 1. CPA's prohibition on unfair and deceptive acts or practices

The CPA forbids "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The CPA is to be "liberally construed that its beneficial purposes may be served." RCW 19.86.920. To prevail on a CPA claim, the AG must prove "(1) an unfair or deceptive act or practice (2) occurring in trade or commerce, and (3) public interest impact." *See State v. Kaiser*, 161 Wn. App. 705, 719 (2001). Unlike private litigants, "the State is not required to prove causation or injury." *Id.*

Here, there is no dispute that BCPF was acting in trade or commerce, as it was soliciting money. Nor is there a dispute that a public charity soliciting money for the benefit of the public "affects the public interest." BCPF's practices affected the public interest because the solicitations occurred in BCPF's course of business as a part of generalized conduct, were repeated, and affected large numbers of people. *See Stephens v. Omni Ins. Co*, 138 Wn. App. 151, 177-78 (2007), *aff'd sub nom.*, *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27 (2009); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 791 (1986). In addition, the legislature has declared that charitable solicitations are "matters vitally affect[ing] the public interest." See RCW 19.09.340.

Whether conduct is unfair or deceptive is a legal question rather than a factual issue. *See Panag*, 166 Wn.2d at 47. There are two methods for the AG to meet its burden to show an unfair trade practice in this case. First, the AG can show that the conduct violated the CSA, which the Legislature has declared to be per se unfair trade practices. *See* RCW 19.09.340. Second, acts or practices are deceptive if they have "the *capacity* to deceive a substantial portion of the public." *Hangman Ridge* 105 Wn.2d at 785 (emphasis in original). The AG does not have to prove either intent to deceive or actual deception. *Panag*, 166 Wn.2d at 63.

MEMORANDUM OPINION - 39

[A] communication may contain accurate information yet be deceptive.
Deception exists if there is a representation, omission or practice that is
likely to mislead a reasonable consumer. In evaluating the tendency of
language to deceive, [one] should look not to the most sophisticated
readers but rather to the least.

*Id.* at 50 (discussing the FTCA) (internal quotations and citations omitted). For the reasons set forth

below, I conclude that Legacy's and BCPF's conduct was unfair and deceptive.

### 2. **BCPF's failure to include CSA-mandated disclosures as *per se* CPA violations**

The CSA applies to "all entities soliciting contributions for charitable purposes." RCW

19.09.100. Thus, both BCPF and Legacy were required to comply.

RCW 19.09.100 provides in relevant part that,

> (1) Any entity that directly solicits contributions from the public in this
> state must make the following clear and conspicuous disclosures at the
> point of solicitation:
> . . .
> (b) The identity of the charitable organization and the city of the
> principal place of business of the charitable organization;
> . . .
> (2) A commercial fund-raiser must meet the required disclosures
> described in subsection (1) of this section clearly and conspicuously at the
> point of solicitation and must also disclose the name of the entity for
> which the fund-raiser is an agent or employee and the name and city of the
> charitable organization for which the solicitation is being conducted.
> (3) Telephone solicitations must include the disclosures required under
> subsection (1) or (2) of this section prior to asking for a contribution. The
> required disclosures must also be provided in writing within five business
> days to anyone who makes a pledge by telephone to donate.
> (4) In the case of a solicitation by advertisement or mass distribution,
> including postal, electronic, posters, leaflets, automatic dialing machines,
> publications, and audio or video broadcasts, it must be clearly and
> conspicuously disclosed in the body of the solicitation material that:
> (a) The solicitation is conducted by a named commercial fund-raiser,
> if it is;
> . . .
> (7) Any entity soliciting charitable contributions must not misrepresent
> orally or in writing:
> . . .
> (c) That the person soliciting the charitable contribution is a member,
> staffer, helper, or employee of the charitable organization or words of

MEMORANDUM OPINION - 40

similar meaning or effect that create the impression that the person soliciting is not a paid solicitor if the person soliciting is employed, contracted, or paid by a commercial fund-raiser.

RCW 19.09.100(1)-(3), (7)

In violation of RCW 19.09.100(1)(b), (2), and (3), Legacy's telephone scripts failed to identify the city of BCPF's principal place of business.

In violation of RCW 19.09.100(2) and (3), some of Legacy's telephone scripts, and Legacy's donor cards and reminder cards failed to "clearly and conspicuously" disclose Legacy's name.

Similarly, in violation of RCW 19.09.100(7)(c), Legacy misrepresented orally and in writing: "[t]hat the person soliciting the charitable contribution [was] a member, staffer, helper, or employee of the charitable organization or words of similar meaning or effect that create[d] the impression that the person soliciting [was] not a paid solicitor." Several of the scripts did not mention Legacy at all, and actually instructed telemarketers to state that they were with the Breast Cancer Prevention Fund. Other scripts instructed telemarketers to say they were with "Legacy calling on behalf of the Breast Cancer Prevention Fund." However, by providing only the partial name "Legacy," the disclosure still fell short of a "clear and conspicuous" statement revealing Legacy's name or commercial fundraiser status. To the extent potential donors may have picked up on the potential significance of "Legacy," the scripts immediately downplayed the distinction by conflating the two entities through rhetoric. The scripts consistently referred to "we" and "our" in relation to BCPF, making it sound as though the Legacy telemarketer was affiliated with BCPF.

Likewise, the donor cards and reminder cards mailed to consumers to attempt to collect pledged donations did not "clearly and conspicuously" disclose Legacy's name, and made it appear as though the cards were from BCPF rather than Legacy. Legacy employees mailed the cards in envelopes that displayed a large BCPF logo, without any reference to Legacy. Upon opening the mailing, consumers

MEMORANDUM OPINION - 41

found cards printed on BCPF letterhead with a prominent BCPF logo, listing BCPF's website and BCPF's non-profit tax ID number. In addition, many of the cards were signed by Legacy employees with their personal names, identifying themselves as a "fundraising coordinator" or "outreach specialist" -- without reference to Legacy at all. Signing the cards in this manner improperly made it appear as though those Legacy employees were affiliated with the Breast Cancer Prevention Fund rather than Legacy. This is particularly true given that the cards were received by consumers after Legacy telemarketers failed to properly identify Legacy during the prior solicitation calls.

Indeed, many of the cards made no reference to Legacy whatsoever, anywhere on the card. Some cards included very small print in the bottom right hand corner that stated "Fundraising provided by LTC." However, the provision of the acronym "LTC" still falls far short of a "clear and conspicuous" disclosure of Legacy's name. Moreover, provision of the acronym "LTC" does not ameliorate the plethora of details suggesting that the card was from a BCPF employee rather than Legacy.

### a. RCW 19.09.100(7)(c) does not violate the First Amendment

Legacy and Paton assert that RCW 19.09.100(7)(c) is vaguely worded, over broad, and not narrowly drawn to serve the stated purpose of preventing deceptive and dishonest practices. They assert it should be considered void for vagueness and unnecessarily interfering with free speech and association. I disagree.

Fraudulent charitable solicitation is not protected speech. *See Illinois ex. rel Madigan v. Telemarketing Assocs. Inc.*, 538 U.S. 600, 612 (2003). As drafted, RCW 19.09.100(7)(c) clearly and narrowly prohibits a commercial fundraiser from making an express or implied misrepresentation that they are volunteer or employee of a charity. The statute "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *See United States v. Williams*, 553 U.S. 285, 304 (2008). Courts

MEMORANDUM OPINION - 42

consider "whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (internal marks omitted).

Here, I conclude the application of RCW 19.09.100(7)(c) to the content of the donor cards is not vague in any respect. The donor cards not only create the misleading impression that they are being sent by BCPF, but *also* then fail to appropriately identify Legacy or its role as a commercial fundraiser. Under any sensible interpretation, Legacy's donor cards did not satisfy the directive or purpose of the statute.

### b. **RCW 19.09.100(4)(a)**

The AG asserted that the donor cards violated RCW 19.09.100(4)(a), by failing to include a clear and conspicuous disclosure "in the body of the solicitation material" that "[t]he solicitation [was being] conducted by a named commercial fundraiser." However, I conclude that RCW 19.09.100(4) does not apply because the donor cards were not advertisements or mass distributions. Rather, the donor cards were targeted mailings sent to individuals who had already demonstrated a specific interest in donating money to BCPF.

### 3. **Violations of the CSA and CPA from July 2011 through March 2013**

The AG will ultimately seeks to collect penalties for violations of the CSA and CPA occurring from July 2011 through March 2013. As set forth above, this is appropriate under the statute of limitations. *See* RCW 4.16.100. From July 2011 through March 2013, BCPF sent 202,470 pledge cards and 190,649 reminder cards, for a total of 393,119 mailings. It is unclear exactly which pledge card and reminder card version was sent during any particular time period. It is unclear on this record how many

MEMORANDUM OPINION - 43

statutory violations were contained within those mailings. Therefore, calculation of the number of

violations must await the evidentiary hearing.

### 4. **Capacity to deceive regarding the allocation of money**

The AG asserts that BCPF's representation that 87% to 93% of money raised went to program

services was deceptive and misleading for three reasons. First, the AG asserts that any allocation of

money under the joint cost accounting rule was improper as determined by Judge Lasnik and BCPF's

use of the rule was misleading. Second, the AG asserts that even if the joint cost accounting rule did

apply, BCPF concealed its practice of calling prior donors, resulting in an inflation of the number

allocated away from fundraising. Third, the AG asserts that even if accurate and appropriate, the

statements were misleading to members of the general public who are not expected to understand

obscure accounting rules.

### a. **Judge Lasnik's ruling**

Judge Lasnik ruled that, for accounting purposes, BCPF was not entitled to use the joint cost

accounting rule because its contract with Legacy was a percentage contract. The AG asserts that under

the law of the case or collateral estoppel, Judge Lasnik's ruling is dispositive for purposes of

determining whether BCPF's use of joint cost accounting was deceptive for purposes of the CPA.

Under the law of the case doctrine, a "court is precluded from reexamining an issue previously

decided by the same court, or a higher appellate court, in the same case." *In re Watson*, 192 B.R. 739,

750, (9th Cir. BAP 1996). Collateral estoppel, now more often referred to as issue preclusion, applies

where the issue was identical, the issue was actually litigated, the issue was necessarily decided, the

decision was final on the merits, and the party against whom it is asserted is the same. *See In re Silva*,

190 B.R. 889, 892 (9th Cir. BAP 1995).

MEMORANDUM OPINION - 44

I conclude that neither the law of the case nor issue preclusion applies. Both doctrines require that the same issue was previously decided by the prior court. Judge Lasnik made a ruling based on accounting conventions. He did not rule on whether BCPF's definition of program services was deceptive or misleading. The issue before me is therefore different. Judge Lasnik's ruling on the appropriateness of the joint cost accounting rule for accounting purposes is thus not determinative for my consideration of whether BCPF's conduct had the capacity to deceive.

5. **Alleged concealment of practice of calling prior donors**

The AG asserts that BCPF "concealed its practice of calling prior donors, resulting in an inflation of the number allocated away from fundraising." The AG further asserts that "[a]fter uncovering their error, BCPF never bothered to correct its public statements, left the inflated numbers up on its website, and continued to solicit money."

On BCPF's Form 990 for 2011, the amount allocated to "program services" for purposes of joint cost accounting was significantly decreased from prior years. On BCPF's Form 990s for 2005-2010, the percentage allocated to "program services" was between 87% and 93%. On BCPF's Form 990 for 2011 the percentage was 52%. The record suggests that Legacy's practice of calling prior donors on BCPF's behalf may have impacted Clark Nuber's decision to decrease the 2011 allocation to "program services," but it is unclear to what extent calls to prior donors were a factor.

The movants appear to argue that the downward adjustment to program services for year 2011 was a result of BCPF "concealing" its practice of calling prior donors. However, on this record, I cannot make that determination. The AG acknowledges in its own briefing that Paton asked Clark Nuber as early as 2006 whether fundraising activities to prior donors should be categorized as fundraising. (Dkt. No. 227 at 12, n. 54). The movants further appear to argue that the downward adjustment to program services for year 2011 put BCPF on some type of notice that it had been

MEMORANDUM OPINION - 45

improperly using joint cost accounting in prior years and that, as a result, BCPF should have altered its past and ongoing public representations regarding the amount allocated to program services. Although this is a somewhat logical argument, the record is unclear regarding why the downward adjustment was made for year 2011. The record is also unclear regarding the extent to which Legacy called prior donors in any given year, making it difficult to determine how that factor may have affected the appropriateness of joint cost allocations in any given year. Finally, the record is unclear regarding what BCPF was representing to the public on its website after October 2011. I therefore cannot conclude on this record that BCBP concealed its practice of calling prior donors or that related statements by BCBF on its website had the capacity to deceive.

### 6. **BCPF's statements that 87% to 93% of money raised went to program services**

Even if BCPF had appropriately applied joint cost accounting, and even if BCPF's Form 990s were entirely accurate and appropriate by accounting standards, BCPF's plain language representations on its website had the capacity to deceive the public. Every potential donor received a donor card that provided BCPF's website address. The website indicated in various locations that 87% to 93% of money raised went to the "program." Money spent on the "program" was, in turn, then expressly distinguished from money spent on management, general, and fundraising expenses. Similarly, the BCPF rebuttal script used by Legacy telemarketers advised potential donors that 87%-93% of donations went to program services.

Based on these representations, an ordinary donor would not have understood that BCPF's "program" included paying approximately 80% of all funds raised to Legacy, or paying nearly 40% of all funds raised to Paton personally. The extent of funds flowing to Paton is particularly egregious given that BCPF was representing to the public that no member of BCPF's Board was compensated. An ordinary donor viewing the BCPF website would not logically categorize fundraising calls as part of the

MEMORANDUM OPINION - 46

"program," particularly when "fundraising" was separately itemized within the same communication. It is irrelevant that a sophisticated and persistent donor might have been able to sift through the buried facts and accounting details to discover some or all of BCPF's deception. Under the CPA, an entity engages in a deceptive practice even when it uses technically accurate terms if those terms have the capacity to deceive. *Panag*, 166 Wn.2d at 49-50. Therefore, as presented to the general public, BCPF's statement that 87% to 93% of money raised went to their "program" was deceptive.

**7. Capacity to deceive the public about the purpose of BCPF's fundraising**

In order to prove deception in CPA action, the State must only show that the act in question was intended to deceive, but only that it had "the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785.

BCPF's website, and Legacy's BCPF scripts and donor cards used from 2005 to 2010 and from July 2011 forward, were unfair and deceptive. Although the website, scripts, and donor cards referenced education and outreach, they created a misleading impression that a significant portion of the funds raised by BCPF would go toward providing mammograms. For the vast majority of the relevant time period, the scripts' requests for donations were couched in terms of the $90 cost of a mammogram and the number of women helped. Stating that a mammogram costs about $90, and then requesting $180 to help two women, or requesting a $45 donation to "share" the expense implies that the donation collected will be specifically used to pay for a $90 mammogram. The donation request was especially egregious in certain of the scripts which referenced a fictitious waitlist for mammograms. This misimpression was furthered by numerous of the donor cards which provided a dollar figure with a parenthetical correlating it to the number of mammograms it could provide, such as "$90 (one mammogram)." A reasonable consumer receiving these calls would conclude that they were donating to provide women with mammograms.

MEMORANDUM OPINION - 47

Paton and Legacy counter that BCPF never represented that money would be spent *only* for mammograms, and that there was value in the outreach Legacy provided. Indeed, Legacy provided some benefits to consumers in reminding them about the importance of mammograms, and providing certain women with a phone number and/or shower card. Yet, regardless of how these benefits could be quantified in dollars, no reasonable consumer listening to the scripts, receiving the donor cards, or viewing the website could have understood that Legacy received approximately 80% of all funds raised that Paton personally took home approximately 40% of all funds raised -- and that only 16.8% was ever donated to charities actually providing mammograms. Paton and Legacy, rather than uninsured women who needed mammograms, were the primary beneficiaries of the money BCPF raised.

In order to prove deception in CPA action, the State must only show that the act in question was intended to deceive, but only that it had "the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785. In sum, BCPF's website and Legacy's BCPF scripts and donor cards had the capacity to deceive the public into believing that a substantial portion of the money raised by BCPF was going to be used to fund the provision of mammograms.[15]

**F.    Equitable estoppel**

To establish equitable estoppel, one must prove

> (1) an admission, statement or act inconsistent with a claim later asserted;
> (2) reasonable reliance on that admission, statement, or act by the other
> party; and (3) injury to the relying party if the court permits the first party
> to contradict or repudiate the admission, statement or act. Equitable
> estoppel against the government is not favored. Therefore, when the
> doctrine is asserted against the government, equitable estoppel must be
> necessary to prevent a manifest injustice, and the exercise of government

---

[15] To the extent Legacy and Paton argue that any subsequent clarifying representations nullify the potential deception of earlier statements or communications, they are wrong. *See Robinson v. Avis Rent a Car Sys.*, 106 Wn.App. 104, 116 (2001) (noting that "a practice is unfair or deceptive if it induces contact through deception, even if the consumer later becomes fully informed before entering into the contract").

MEMORANDUM OPINION - 48

functions must not be impaired as a result of estoppel. Each element must
be proved by clear, cogent, and convincing evidence.

*Dep't of Ecology v. Theodoratus*, 135 Wash. 2d 582, 599 (1998) (internal quotations and citations

omitted). However, "where the representations allegedly relied upon are matters of law, rather than fact,

equitable estoppel will not be applied." *Id.*; *see also Laymon v. Dep't of Nat. Res.,* 99 Wn. App. 518,

526 (2000).[16]

As set forth in greater detail above, in 2007 the SOS was concerned about the practice of

charities improperly relying on joint cost accounting to inflate the percentage of donations attributable to

"program services." Blacksmith contacted BCPF to suggest that the amount it was reporting as

attributable to program services appeared too high. She was seeking to understand how BCPF had

calculated its allocation attributable to "program services" under joint cost accounting, to determine if

BCPF's disclosure was accurate. Blacksmith communicated back and forth with Paton and

Cunningham, suggesting different possible methodologies for calculating "program services" and

suggesting improvements to BCPF's script. Paton and Legacy assert that through the course of these

communications, Blacksmith ultimately approved BCPF's compliance with RCW 19.09. et seq.

Legacy, Paton and Clark Nuber assert that the AG should be estopped from now claiming that

Legacy's scripts, donor cards, and/or website was deceptive and misleading because Blacksmith, acting

in an authoritative capacity on behalf of the State, approved a version of BCPF's script and approved the

amount BCPF was representing as allocable to its "program services." Similarly, they argue that

equitable estoppel should prevent the state from asserting that BCPF and/or Paton violated their

fiduciary duties of loyalty.

---

[16] *See also e.g., State, Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 20-21 (2002);
*Williams Place, LLC v. State ex rel Dep't of Transp.*, 187 Wn.App. 67, 103 (2015).

MEMORANDUM OPINION - 49

Here, I conclude that the defense of equitable estoppel is inapplicable to the AG's claims. Even if the 2007 communications from Blacksmith to Paton/ BPCF could be construed as approving compliance with RCW 19.09 et seq., or more generally approving Paton and/or BCPF's behavior, the representations regarded matters of law. Equitable estoppel does not apply to state employees' erroneous legal advice or statements of the law. *See e.g., Theodoratus*, 135 Wash. 2d at 599.

I further conclude that the defense of equitable estoppel is inapplicable to the AG's claims because Blacksmith was acting on behalf of the SOS in a governmental capacity in attempting to assure BCPF's compliance with the State's disclosure laws. There is no manifest injustice to Paton or Legacy in regulating charities or enforcing laws to protect the public. It appears Blacksmith's inquiry into BCPF's joint cost accounting may have been a bit overzealous - reaching beyond her expertise, and possibly beyond what her supervisor had intended. However, estoppel "will not be applied where its application would interfere with the discharge of governmental duties or where the officials on whose conduct estoppel is sought to be predicated acted beyond their power." *Mercer Island v. Steinmann*, 9 Wn.App. 479, 481 (1973). Here, applying estoppel based on the conduct of Blacksmith, a diligent state employee attempting to do her job in a thorough manner, would impair the exercise of government function.

In addition, the comments made by Blacksmith are not necessarily inconsistent with claims now asserted by the AG. The scope of any asserted "approval" given by Blacksmith to BCPF's conduct was limited. Although she analyzed and suggested changes to a version of BCPF's script, Blacksmith did not approve the content of BCPF's website, donor cards, rebuttal script, or other versions of its solicitation scripts.

Legacy, Paton and BCPF could not have reasonably relied on Blacksmith's comments. At the time Blacksmith was analyzing BCPF's conduct and disclosures, she was not privy to all of the relevant

MEMORANDUM OPINION - 50

facts. Her comments were based only on limited information that was provided to her by Paton. She had only a script and BCPF's 990s, and was unaware that BCPF and Legacy had a de facto percentage contract that made the application of joint cost accounting, as determined by Judge Lasnik, inappropriate. To the extent Blacksmith drew any meaningful conclusions regarding BCPF's conduct or compliance, her conclusions were expressly conditional and equivocal.[17] Notably, Blacksmith consistently advised Paton that she was not an accountant or a lawyer.[18] Equivocal conclusions drawn from limited information cannot form the basis for reasonable reliance by Paton or Legacy, particularly in the face of repeated caveats.

Furthermore, during the course of analyzing BCPF's script and joint cost accounting methodologies, Blacksmith concluded at various times that BCPF should allocate 65%, 73%, 83%, or 86% of donations received to program services.[19] Paton/BCPF apparently never relied on Blacksmith's suggestions, because Paton/BCPF never represented to the public that these percentages were attributable to program services. Rather, Paton/BCPF reported the figures from the Form 990s. Between 2006 and 2011, BCPF's website represented that 87%-93% of all funds it raised went to its

---

[17] For example, Blacksmith stated that: (a) "[T]he only documentation that BCPF has provided to date to support their allocations is the telephone script. As a result, *our determination is based solely on* the telephone script and a review of BCPF's 2006 IRS Form 990." (Dkt. No. 247-1 at 22) (emphasis added). (b) The script "*seems to include* the necessary disclosures." (Dkt. No. 247-1 at 14) (emphasis added). (c) "[Q]uestions regarding disclosure requirements *appear to be resolved based on the information provided*." (Dkt. No. 247-1 at 14) (emphasis added). (d) "If your accountants advise you that tracking time is not an acceptable approach . . . , then *by all means please follow the advice of your accountants*." (DKt. No. 247-1 at 30) (emphasis added).

[18] For example, Blacksmith stated that: (a) "I'm not an accountant, so my suggestions are those of a lay person . . . ." (Dkt. No. 247-1 at 30). (b) "I would recommend discussing the matter with your accountants/advisors and the IRS." (Dkt. No. 247-1 at 30). (c) "All I can suggest is that you discuss it with your accountant and the IRS to determine what path to take in the future." (Dkt. No. 247-1 at 30). (d) "Our office cannot give legal advice." (Dkt. No. 247-1 at 34). (e) "Your accountant will need to be the one to address whether or not they meet AICPA/ SOP 98-2 guidelines." (Dkt. No. 247-1 at 34).

[19] 65% (Dkt. No. 247-1 at 42), 73% (Dkt. No. 247-1 at 22), 83% (Dkt. No. 247-1 at 42), or 86% (DKt. No. 247-1 at 60)

MEMORANDUM OPINION - 51

"Program."  In addition, regardless of whether the joint cost accounting methodologies were accurate or not, BCPF used the numbers to deceive donors into believing that the money donated went to mammograms and to conceal the truth that nearly 40% of the money raised went to Paton's bank account.

**G.    Laches**

"Laches is an equitable defense based on the principles of equitable estoppel." *City of Cheney v. Bogle*, 2008 Wash.App. LEXIS 999, at *26 (May 1, 2008).  Laches applies where there is (1) knowledge of or reasonable opportunity to discover a cause of action, (2) unreasonable delay in commencing that cause of action, and (3) damage to the defendant resulting from the unreasonable delay. *See Valley View Indus. Park v. Redmond*, 107 Wn.2d 621, 635 (1987); *Hunter v. Hunter*, 52 Wn. App. 265, 270 (1988). It does not apply, absent very unusual circumstances, before the statute of limitations runs. *Carillo v. City of Ocean Shores*, 122 Wn. App. 592, 610 (2004).

Laches will not be applied against the government "acting in a governmental capacity unless it is clearly necessary to prevent obvious" or manifest injustice. *See Maynard v. King Cty.*, 2009 Wash. App. LEXIS 1949, at *11, 15-16 (Wash. Ct. App. Aug. 3, 2009) ("The policy against applying equitable estoppel to the government, as stated in *Steinmann*, also applies to laches.").

Paton and Legacy assert that laches applies to the AG's request to calculate the number of violations (for purposes of later collecting penalties).  They assert that from the time the State received Carl Hu's May 11, 2011 complaint, it could have issued a cease and desist order regarding BCPF's alleged violations. Instead, the AG commenced a two-year investigation and left BCPF to continue operating without knowledge that it was accruing approximately 300,000 alleged statutory violations per year. Paton and Legacy assert is a manifest injustice to permit the AG to go back and claim penalties for two of that time, from July 2011 to July 2013.

MEMORANDUM OPINION - 52

**Below is a Memorandum Decision of the Court.**

Clark Nuber asserts laches applies to the AG's assertions that BCPF's disclosures to the public were deceptive or misleading under the CSA. Clark Nuber asserts that as of 2007 the State had all of the information in its possession necessary to evaluate BCPF's disclosures including BCPF's 2006 Form 990, the BCPF-Legacy Contract, and a copy of the BCPF script. Clark Nuber asserts that the State allowed BCPF to continue operating for almost six years after receiving this information and that it is unreasonable for the AG to have waited so long to bring its claim of deceptive or misleading disclosures.

As with the equitable estoppel defense, here, I conclude that laches is inapplicable as a defense to the AG's claims. In regulating and investigating BCPF, the SOS and AG were acting in their governmental capacities. There is a compelling state need to regulate charities to protect the public, and the SOS and AG are the government agencies tasked with regulation and enforcement. Earlier decisive legal action by the AG may indeed have prevented Legacy, Paton, and Clark Nuber from accruing so many violations or making so many misrepresentations. However, it is not manifestly unjust to hold a charity accountable for violating the CSA or CPA – particularly since BCPF was long on notice that it was being investigated. *See e.g., Maynard*, 2009 Wash. App. LEXIS 1949, at \*16 ("[T]he County cannot be precluded from enforcing its zoning regulations even though its officials remained inactive in the face of such violations.").[20]

---

[20] Moreover, the inapplicability of laches to the State in this context is bolstered by the plain language of RCW 4.16.160. It provides in relevant part that, "there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state."

MEMORANDUM OPINION - 53

**H.** **Damages**

**1.** **Breach of fiduciary duty of loyalty**

For the claims premised on breaches of the fiduciary duty of loyalty, the Trustee asserts a portion of the AG's claim should be allowed in the amount of $7,616,389, representing disgorgement of the amount by which Paton benefited from BCPF's operations. This figure encompasses money earned while Paton was both the President of BCPF and the owner of Legacy. The AG asserts that it is entitled to not only these funds, but also the earnings Paton made after he resigned, and that the AG's claim should be allowed in the amount of $8,491.021. The AG argues, in the alternative, that I have the power to order restitution, or that I should impose a constructive trust.

I conclude that on this record, I cannot assess damages or determine that the AG's breach of fiduciary duty claim should be allowed in any particular amount. I have genuine disputes of material fact surrounding the relationships between Paton, Legacy, BCPF, and BCPF's other Board members, the extent of Paton's personal benefit derived therefrom, and I am unable to determine on this record whether BCPF and/or Paton breached the fiduciary duty of loyalty regarding the trust composed of the funds contributed by BCPF donors.

**2.** **CSA and CPA**

As for the claims premised on the CSA and CPA, I conclude that on this record I cannot appropriately determine the number of violations or quantify the AG's claim for restitution.

First, the AG requests that I find 786,238 violations of the CSA and CPA (spanning from July 2011 through March 2013) to later calculate penalties. However, without greater clarity and detail, I cannot accurately count the number of CPA violations that will form the basis of the AG's claim for penalties. Although a plethora of donor card and reminder card versions appear in the record, relevant to the period spanning the statute of limitations (July 2011 through March 2013), the AG has not

MEMORANDUM OPINION - 54

clarified what version(s) of the donor cards and reminder cards were used. In addition, the AG asserts there were at least two violations of the CPA per donor card and reminder card, but does not specify what violation(s) each mailing contained. I have concluded that the donor cards and reminder cards in the record violated the CSA and CPA, and I have no doubt that there were thousands of violations during the relevant time period, but without more specificity, I cannot conclusively tabulate the number of actual violations.

The AG asserts that the amount lost by BCPF donors is the entire amount of money raised ($22,763,546), less the amount actually forwarded on to programs that provided mammograms ($3,820,921), for a net loss of $18,942,625. It also asserts that its claim for restitution should be allowed in that amount. Despite already concluding that Legacy's and BCPF's representations regarding the amount spent on program services and the provision of mammograms had the capacity to deceive the public, on this record I cannot accurately assess the amount of restitution to which the AG is entitled.

It is apparent that Legacy's conduct included unfair and deceptive practices. However, it is difficult to quantify the "loss" attributable to those practices that were "capable of deceiving a substantial portion of the public." In addition, there arguably was *some* value to the public in the other services provided by Legacy/BCPF, including education and the provision of shower cards and referrals, even if de minimis. These equitable and fact-specific matters will be more appropriately resolved after conducting an evidentiary hearing. I also will be able to take into account damages awarded in connection with other claims, to avoid duplication or inconsistency.[21]

---

[21] Clark Nuber asserts that any actions by Legacy that were violations of the CSA or CPA were *ultra vires* and did not create liability for BCPF. Given, *inter alia*, the overlap in management and the extensiveness of Legacy's duties under the BCPF-Legacy Contract, it is hard to imagine that BCPF is not liable for misleading communications made to the public by Legacy. However, the parties are free to present evidence at the evidentiary hearing on this issue.

MEMORANDUM OPINION - 55

IV. <u>**CONCLUSION**</u>

Counsel for the parties should submit appropriate forms of order consistent with this memorandum opinion, partially granting the Trustee's Motion Regarding Breach of Fiduciary Duties and partially granting the AG's Motion Regarding Violation of the CSA and CPA.

/// **END OF ORDER**///

MEMORANDUM OPINION - 56